J.  D.  LANCASTER, Respondent, v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, February 7, 1910.

1.  NEGLIGENCE: Railroads: Master and Servant: Sufficiency of Evidence.   Plaintiff was a car inspector at Ottawa, Kansas. At the time of his injury he was performing a regular duty inspecting the cars on a newly arrived train.   According to plaintiff's evidence this duty had to be performed rapidly and before the train was broken up by a switching crew.   On account of his size, and the proximity of the track on which the switch engine ran, and the engrossing nature of plaintiff's duties, the switch engine had always signalled its movements to plaintiff by the ringing of its bell.   On the occasion in question the engine approached plaintiff without such warning and he was struck by the engine and lost a leg.   Under the evidence the questions of negligence and contributory negligence were for the jury.

2.  ———: ———: ———: Appellate Practice: Sufficiency of Evidence.   In considering a demurrer to the evidence the facts will be considered in the light which most strongly tends to support the plaintiff's case.

3.  ———: ———: Humanitarian Doctrine.   The facts in this case do not present a cause of action under the humanitarian doctrine.

Lancaster v. Railroad.

4. ———: ———. In cases founded on the humanitarian doctrine the measure of duty is not the same in an employee's case that it is in a passenger's or a stranger's case.

5. ———: ———: ———. The operation of a railroad requires a strict adherence to system and discipline, and, within the bounds of reason, a railroad company may establish rules of precedence among its various classes of vehicles and employees, and require their observance. In such event the employee with the right of way may assume, until notified otherwise, that other employees will look out for themselves, and an injury resulting from the violation of such duty to look out is ordinarily assumed by the injured servant. The humanitarian doctrine is strictly applied in such cases.

6. ———: ———: ———. The right of recovery in this case is founded, not on the basis that the switch engineer saw or should have seen plaintiff in a position of peril in time to have saved him, but on the basis that the settled custom of business at the place in question threw on defendant the duty to warn plaintiff of the approach of the switch engine and that it negligently failed to give such warning.

7. ———: ———: Master and Servant: Fellow Servants. A car repairer and the members of switching crew are not fellow servants.

Appeal from Jackson Circuit Court.—*Hon. Hermann Brumback*, Judge.

AFFIRMED.

*Thomas R. Morrow, Cyrus Crane, James P. Gilmore, Samuel W. Sawyer* and *John H. Lathrop* for appellant.

(1) The defendant's employees were not guilty of negligence. Evans v. Railroad, 178 Mo. 508; Cahill v. Railroad, 205 Mo. 393; Sissel v. Railroad, 214 Mo. 515; McKee v. Railroad, 96 Mo. App. 671. (2) The plaintiff was guilty of contributory negligence. Moore v. Railroad, 146 Mo. 572; Davies v. Railroad, 159 Mo. 1; Hurst v. Railroad, 163 Mo. 309; Evans v. Railroad, 178 Mo. 508; Clancy v. Railroad, 192 Mo. 615; McGrath v. Transit Co., 197 Mo. 97; Cahill v. Railroad, 205 Mo.

393; Brockschmidt v. Railroad, 205 Mo. 435; Sissel
v. Railroad, 214 Mo. 515; Grout v. Central Electric
Co., 125 Mo. App. 552; Schaub v. Railroad, 113 S. W.
1163. (3) The switch crew, including the engineer
and fireman, were fellow servants of the plaintiff, and
he cannot recover for their negligence, even if they
were negligent. McDermott v. Railroad, 30 Mo. 115;
Rohback v. Railroad, 43 Mo. 187; McGowan v. Rail-
road, 61 Mo. 528; Long v. Railroad, 65 Mo. 225; Zim-
merman v. Railroad, 71 Mo. 476; Blessing v. Railroad,
77 Mo. 410; Corcoran v. Railroad, 78 Mo. 567; Renfro
v. Railroad, 86 Mo. 302; Parker v. Railroad, 109 Mo.
362; Card v. Eddy, 129 Mo. 510; Lanning v. Railroad,
196 Mo. 647; Koerner v. Car Company, 209 Mo. 141;
Tabor v. Railroad, 210 Mo. 385; Strottman v. Railroad,
211 Mo. 227; Broadwater v. Railroad, 212 Mo. 437;
Mathieson v. Railroad, 118 S. W. 9.

*E. H. Gamble, Clyde Taylor* and *W. J. Costigan* for
respondent.

(1) Appellant was negligent in not warning re-
spondent of the locomotive's approach. Koerner v. Car
Co., 209 Mo. 142; Brick Co. v. Shanks, 69 Kan. 306, 76
Pac. 856; Johnson v. Railways, 203 Mo. 381; 23 Am.
and Eng. Ency. Law (2 Ed.), sub. "Negligence," p.
768; 5 Thompson on Negligence, p. 187; Railway
v. McGlamory, 89 Tex. 635, 35 S. W. 1058; Steffe v.
Railway, 156 Mass. 262, 30 N. E. Rep. 1137; Taylor v.
Railway (Tenn. 1893), 27 S. W. 663; Railway v. Slat-
tery, 57 Kan. 409; Dickson v. Railway, 104 Mo. 504; Gu-
lick v. Clarke, 51 Mo. App. 33; Snyder v. Railway
(1899), 60 Ohio St. 477, 54 N. E. 475. (2) Respond-
ent, a car inspector, not a fellow servant with switch-
ing crew. Parker v. Railway, 109 Mo. 391; Sullivan
v. Railway, 97 Mo. 113; Murphy v. Railway, 98 Mo.
537; Dayharsh v. Railway, 103 Mo. 575; Koerner v.
Car Co., 209 Mo. 142; Miller v. Railway, 112 Mo. 86;

Schlereth v. Railway, 115 Mo. 87; Jones v. Railway, 178 Mo. 528; Young v. Railway, 196 Mo. 647.

JOHNSON, J.—This is a personal injury suit brought to us by appeal from a judgment of $7500, in favor of plaintiff. The injury occurred during the night of April 12, 1904, in the yards of defendant at Ottawa, Kansas, a division station. Plaintiff was working for defendant as night car inspector and had been thus employed for two weeks. It was his duty to inspect trains that came into the station and to designate cars found in bad order. Among them, was a mixed train called "the Burlington," which arrived off a branch line at about nine o'clock every evening. Ottawa was the end of this train's run and in a few moments after the arrival of the train the switching crew would begin to break it up and distribute its cars over the yard. During the brief period the train stood at the depot, plaintiff was expected to inspect the cars, and it was while he was engaged in this task that a switch engine struck and hurled him to the ground and ran over one of his legs.

The tracks of defendant at Ottawa run north and south and immediately south of the union depot are crossed by Tecumseh street, a public thoroughfare. The Burlington train came in from the south, on the east track, and stopped in front of the depot. The locomotive stood at a point opposite the end of the depot platform and about 350 feet north of Tecumseh street. In a few moments it was detached from the train and run forward. Eight feet west of the track on which the train stood was a parallel track. Immediately north of the depot platform and just east of the first track stood a switch shanty. While plaintiff and the crew of the switch engine were waiting for the arrival of the Burlington train, they stayed in the shanty, but as the train came in, the crew went to their engine which stood on the east track and then

pulled forward to the connecting track which enabled them to pass on to the parallel track we have mentioned. Then the switch engine was started south on that track for the purpose of running down to a point south of Tecumseh street where another connecting track would enable it to reach the east main track and then to be backed up to the rear end of the Burlington train. In the meantime, plaintiff had proceeded without delay to inspect the cars of the newly arrived train. He was compelled to work diligently to accomplish his task before the switch engine would begin to break up the train. He had been instructed to finish the inspection while the train stood at the depot. We quote from his testimony:

"A. Why he (the foreman) said if we did not inspect it just as soon as it came into the yard, it was tore all to pieces and scattered all over the yard and put into some other train and hauled off; and that it had to be inspected just as soon as it came into the yards. . . .

"Q. How long a time did the train stand there before it was broken up? A. Sometimes it was broken up right away. At other times the switch engine would be busy or doing something else and they could not get to it for some little time.

"Q. Did you always have time to finish the inspection before the train was broken up? A. Most of the time.

"Q. But sometimes you did not? A. No, sir."

Plaintiff had been instructed to begin his work on the west side of the train. He testified: "A. He (the foreman) said 'We always tack our bad order cards on the northwest corner on the west side of the cars, and that saves a whole lot of trouble in running around the cars.' He says a man can examine a car from the west side all in under, and if he sees anything the matter with the car he can tack his card on and

he is done with that car. 'Therefore,' he says, 'we always begin on the west side of the train.' "

The evidence of plaintiff tends to show that while the switch engine was passing down the west track it cleared the cars of the Burlington train by three feet and seven inches. Plaintiff, who weighed one hundred and eighty-five pounds and whose body was twenty-six inches wide, was working between the two tracks. He thus relates what befell him:

"Q. Go ahead and tell us just what happened and what you did. A. I inspected on down some seven or eight cars.

"Q. Tell us what you did. A. I first looked at the trucks on the north side; the north side of the trucks under the north end of the car, and then I walked on a step or two and looked at the south side of the same trucks, and then passed on down and examined the air-brakes in the center of the car, and then passed on down to the south end and looked at the north side of the south trucks, passed on and looked at the hand-holds, and on down to the next car in the same way until I came to the last car in the train next to the accommodation coach. I inspected the north end of that car, passed on down to the center and inspected the north side of the trucks at that end, the trucks under the south end of the car, and turned around and straightened up to flash my lantern on the handholds and I was struck and knocked down.

"Q. What struck you? A. The switch engine.

"Q. In what direction was it moving? A. South.

"Q. Which way were you facing at the time it struck you? A. Southeast.

"Q. Where did it strike you? A. Along right on the side of the leg and hip.

"Q. Which leg? A. The right leg.

"Q. When it struck you, you were thrown down? A. Yes, sir.

"Q. What happened? A. Why, it knocked me some ten or fifteen feet and I rolled over a time or two and fell with my head first or to the east and with my feet to the west with one foot over the rail.

"Q. Go on. A. It ran over me and it stopped; it got about four feet by me before it stopped."

The switch engine did not ring the bell, was not using steam, was making but little noise, and plaintiff was not conscious of its stealthy approach. He looked for it as much as his work would permit. We quote again from his testimony:

"Q. Going back to what happened just before and at the time of this accident again; state whether you had looked to the northward at any time after you started in inspecting this Burlington train before you were struck by the switch engine? A. Yes, sir.

"Q. Did you look up at any regular intervals in the course of your work there, or not? A. I generally would inspect one side of the truck and then look up, and then inspect the other side of the truck and then look up, and then go to the center and inspect the air-brake and then look up.

"Q. You say that after you would inspect a truck you would look up, and then inspect the other side of it and then look up again? A. Yes, sir.

"Q. When you were inspecting the truck from the north side of it, which way would you look after inspecting that? A. Facing north; no, facing south.

"Q. Then, when you would inspect the truck from the south side, what would you do? A. Look to the north.

"Q. So you would look alternately to the south and then to the north? A. Yes, sir.

"Q. I want you to state not only with reference to what you would do in regard to looking at the truck, but what you did with reference to keeping a lookout on that track behind you. · A. As soon as I examined the north side of the truck I would straighten up and

look alongside of the train (indicating to the north) and then turn and look under the south side of the truck and then look off down this way to the south, and then pass down to the center of the train and then on down to the other end of the car; I meant the center of the car.

"Q. And did you keep up that process while you were inspecting that train? A. Yes, sir.

"Q. Why did you look up along the track? A. I knew the switch engine was some place and was keeping a watch out for it.

"Q. Where were you when you last looked along the track to the west of you; I mean along the west main track? Where were you standing when you last looked along the west main track before you were struck? A. I was a little past the center of the car.

"Q. A little past the center of that car? A. Of the car I was inspecting.

"Q. That was the last freight car of the train, was it? A. Yes, sir."

It appears that to inspect the handholds which projected several inches from the side of the car, plaintiff had to stand away from the car to an extent that would bring his body within range of the pilot beam of the passing engine and it was his habit to stop work entirely while the engine was passing. He testified:

"Q. Had you been between those tracks engaged in inspecting that Burlington train when that switch engine passed down the west track? A. Yes, sir.

"Q. Did you continue your work of inspection while it was passing? A. No, sir.

"Q. What did you have to do? A. Straighten up and stand up against the cars to let it go by.

"Q. Was that necessary? A. I didn't have room to work.

"Q. Was that necessary to avoid the engine as it came by? A. Yes, sir."

Plaintiff further said that it was the custom of
the yard for the switch engine to give warning of its
approach:

"Q. Was there any custom with reference to the
ringing of the bell, or giving other warning of the ap-
proach of this engine when it would pass you when
you were inspecting the Burlington train? . . . A.
Yes, sir.

"Q. What was the custom? A. It was always
customary to ring the bell . . . and to give signals
when going down in front of the depot.

"Q. When was this customary ringing of the bell
begun, just as they passed, or before they reached you?
A. Always before they reached me before.

"Q. Had you ever known it to pass by there while
you were making that inspection without the ringing
of the bell? A. No, sir.

"Q. Had it passed you frequently or not before
this time? A. Yes, sir.

"Q. Now, what was it that you would do when
you would hear the ringing of the bell and become
aware of the approach of the switch engine? A. Simp-
ly straighten up against the car so that it could pass."

The facts adduced by defendant differ materially
from those we have stated which are collected from the
evidence of plaintiff. The evidence of defendant tends
to show that the injury was due entirely to plaintiff's
own negligence and not to any negligence of the crew
of the switch engine. It is denied that any rule or
custom of the yard required the giving of warnings to
car inspectors and it is insisted that they were required
to look out for the approach of switch engines and to
keep out of the way. Witnesses for defendant say
that as the engine approached plaintiff, he was in the
clear, that he betrayed no indication of being in peril
and that suddenly, he stepped back far enough to be
caught by the end of the pilot beam. Further, they
say it was customary only to ring the bell at the cross-

ing of Tecumseh street; that the engine carried a headlight, that it was in plain sight, that it was equipped with solid brasses which made considerable noise when it was running, and that there was no necessity for an inspector, in the proper performance of his duty, to project any part of his body beyond the clear space.

The petition charges "that said negligence and recklessness was in defendant's failure to warn plaintiff of the locomotive's approach, or to stop it before it reached him, or to use any care to avoid running him down; and in the further fact that defendant after it could by ordinary care have known of plaintiff's danger, still could have avoided injuring plaintiff by doing the things which it is above alleged defendant failed to do."

Among the special defenses interposed by the answer are those of assumed risk and contributory negligence. First, we shall dispose of the argument of defendant that the court should have instructed the jury to return a verdict in its favor, and in the consideration of the questions discussed we shall assume the facts to be as the evidence of plaintiff presents them. We shall assume that plaintiff was required to work with diligence to perform his task in the allotted time; that he could not do his work and also maintain a proper lookout for the engine; that his safety compelled him to stop while the engine was passing, as the clear space did not afford him sufficient room while at work, and that the operators of the engine were expected to look out for him and to warn him of its coming.

We think the only cause of action plaintiff could have must rest on a negligent breach by the crew of the switch engine of a duty to keep a lookout for plaintiff and to warn him, by ringing the bell, of the approach of the engine. The facts of the case, even in the light most favorable to plaintiff, do not present a cause of action founded on the humanitarian doctrine. As

was observed by the Supreme Court in Cahill v. Railway, 205 Mo. 393: "Plaintiff was an employee; therefore, the measure of duty to him was not such as to a passenger or stranger."

Undoubtedly, defendant would have had the right to require its yard men, including car inspectors, to look out for engines and trains and to keep out of their way and to relieve train men from the duty of giving warning signals to such employees. As we have observed in other cases, the business of operating a railroad being highly complex, calls for a strict adherence to system and discipline and within the bounds of reason, a railroad company may establish rules of precedence among its various classes of vehicles and employees, and may require that one class shall accord the right of way to another. [Mack v. Railway, 123 Mo. App. 531; Williamson v. Railway, 139 Mo. App. 481.] And where the rules of the company give an engineer the right of way over yard employees, he has the right to presume, until the contrary fact clearly appears, that such employees are on the lookout and will get out of his way. In such cases, the risk of injury the yard employee incurs must be classed as one of the natural risks of the business conducted by the master in his own way and within the limits of reasonable care, and, as such, a risk assumed by the servant. Great care should be observed by the courts in the application of the humanitarian doctrine to such cases. The Supreme Court pertinently say in Evans v. Railway, 178 Mo. 508:

"It will not do to apply this rule in all of its strictness to section men whose business it is to work upon and keep in repair railroad tracks, for they are supposed to look after their own personal safety, and to know of the time at which trains pass, to look for them and see them, and to move out of the way. It is of common knowledge that these men often voluntarily wait until trains get dangerously close to them, and then

step out of danger and let them pass by, and to require trains to stop upon all such occasions, when section men are discovered at work on the track, would not only be imposing upon railroads unjust burdens, but would greatly interfere with traffic and travel. Those in charge of trains have the right to presume in the first place that such persons will keep out of danger, and not until they have good reason to believe they will not do so, and then fail to use all proper means at their command to prevent injuring them, in consequence of which they are injured, or are injured by reason of the willful negligence of those in charge of the train, should the defendant be held liable, and there was nothing of that kind in this case."

And in Cahill v. Railway, supra, it was said: "The plaintiff knew that he was at work in a railroad yard where trains and engines are frequently passing. There was no undertaking on the part of the defendant to give him warning, but he was expected to look out for himself. If the engineer failed to sound the whistle, or ring the bell, it was not negligence for which the defendant was responsible. . . . The ringing of bells and the sounding of whistles on trains going and coming, and switch engines moving forwards and backwards, would have simply tended to confusion."

If the rules or usages of defendant's business had required plaintiff to look out for himself and had absolved the switching crew from the duty of giving him warning, there was nothing in the fact that he was engaged in the performance of his work to suggest that he was in danger. At most, he was just over the line. A slight shifting of his position was all that was needed to place him in safety and the engineer would have been justified in assuming that he would get out of the way. There was no negligence of defendant either under the humanitarian rule or under any other rule or principle of law on the hypothesis that it was plaintiff's duty to look out for himself, and on that hypothesis, his injury

must be regarded as a product either of his own negligence in becoming absorbed in his work or of a risk of the employment he assumed.

But plaintiff says, and his evidence must be acknowledged to be substantial, that the settled custom of the business did not throw on his shoulders the responsibility of looking out for the switch engine, but on the contrary, imposed the duty on the switching crew to give him warning. Defendant says the bell was rung not for the benefit of the car inspector, but for the street crossing. This is denied by plaintiff who adduces facts and circumstances which afford a very good reason for the custom he says existed. The inspector had to work rapidly, his work was important and exacting, and necessarily his attention would become absorbed. His duties were of a character wholly different from those of a section hand or a laborer employed to sweep snow off the track—employments under consideration in the Evans and Cahill cases. It is reasonable to think that defendant, aware of the great and unnecessary danger a car inspector would incur in working under the conditions described, imposed the duty on the switching crew of giving him warning. A breach of that duty would constitute actionable negligence, and we conclude that plaintiff has sustained his burden of proof and was entitled to go to the jury on the issue that failure to ring the bell was the proximate cause of his injury.

Point is made that since the injury occurred in Kansas we must assume that defendant would not be liable in that State for an injury caused by the negligence of fellow-servants and should hold that plaintiff was injured by such negligence. We shall dispose of this contention by saying that plaintiff and the switching crew were not fellow-servants. We have just considered the questions argued in a case decided at this term (Kelly v. Railroad, 141 Mo. App. 490), and

refer to the opinion in that case for a full expression of our present views.

Further, it is argued that plaintiff should be held guilty in law of contributory negligence. We do not think so. He had a right to rely on the performance of the duty to give him warning, and his evidence shows that he used his own senses for his protection to the full extent his duties would allow. His conduct, at most, was an issue of fact to go to the jury.

The demurrer to the evidence was properly overruled.

The objections to the rulings of the court in the giving and refusing of instructions have been sufficiently answered in what has been said. We find no substantial error in these rulings. The case was fairly tried and it follows that the judgment must be affirmed. All concur.